The document below is hereby signed.

Signed: August 2, 2018



_S. Martin Teel, Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MAYFAIR CORCORAN, LLC, | ) | Case No. 17-00513 |
| | ) | (Chapter 11) |
| Debtor. | ) | Not to be published in |
| | ) | West's Bankruptcy Reporter. |

MEMORANDUM DECISION AND ORDER
DENYING MOTION FOR STAY PENDING APPEAL

The *Motion of Peter Odagbodo to Stay Orders of this Court Entered June 26, 2018 Directing Preimium [sic] Title & Escrow, LLC to Turn over Security Deposit to Debtor (#176) and its Order Denying Motion to Turn over Security Deposit to Peter Odagbodo (#178)* (Dkt. No. 180) ("*Motion*") must be denied for the following reasons.

I

The debtor was the owner of an apartment project known as the Corcoran House Apartments ("Property"). The debtor entered into two loan agreements with Federal National Mortgage Association ("Fannie Mae") secured by the Property through two deeds of trust. The debtor defaulted on its loans with Fannie Mae, resulting in a receiver being appointed by the Superior

Court of the District of Columbia.  The debtor initiated this case shortly after the receiver was appointed by filing a voluntary petition on September 13, 2017.

On December 6, 2017, the debtor entered into an "as is" *Purchase and Sale Agreement* ("*Purchase Agreement*") with Peter Odagbodo for the sale of the Property.  Under the *Purchase Agreement*, Odagbodo made a $100,000 deposit with Premium Title & Escrow, the title company Odagbodo hired to handle closing on the Property.  The *Purchase Agreement* provided in paragraph 2 that the deposit "shall be held as earnest money and shall be applied as part payment of the Purchase Price at closing or as otherwise provided herein."  It further provided in paragraph 3 that "[i]f this Agreement is voided by Buyer for any reason permitted under this Agreement, the Deposit shall be refunded to Buyer, and no party hereto shall have any further rights to said Deposit." Odagbodo never voided the *Purchase Agreement*.  The *Purchase Agreement* also provided that the deposit would be liquidated damages for a default by Odagbodo, unless Odagbodo's default was

caused by the debtor.[1] On December 14, 2017, the court entered an order approving the sale conditioned upon the debtor being authorized to assume and assign the leases to Odagbodo. On January 5, 2018, the court entered an order authorizing the debtor to assume and assign the leases to Odagbodo incident to the sale as contemplated by the *Purchase Agreement*.

The *Purchase Agreement* set the closing at "forty five days after seller can deliver clear title (the 'Closing Date') or at such other time as is reasonably agreeable to Buyer and Seller with at least five (5) days notice prior to the Closing Date," but the court's sale order, which became effective on January 5, 2018 (upon the court's approving assumption and assignment of the leases) provided that the sale was free and clear of all liens (but required that proceeds to be held for payment of Fannie Mae's liens be sufficient to pay those liens, including any

---

[1] As set forth in *Purchase Agreement*, ¶ 11:

> 11. LIQUIDATED DAMAGES: By placing their initials immediately below, Buyer and Seller agree that it would be impracticable or extremely difficult to fix actual damages in the event of a default by Buyer, that the amount of Buyer's Deposit hereunder (as same may be increased by the terms hereof) is the parties' reasonable estimate of Seller's damages in the event of Buyer's default, and that upon Buyer's default in its purchase obligations under this agreement, not caused by any breach by Seller, Seller shall be released from its obligations to sell the Property and shall retain Buyer's Deposit (as same may be increased by the terms hereof) as liquidated and agreed upon damages, which shall be Seller's sole and exclusive remedy in law or at equity for Buyer's default.

disputed amounts, in full).  The closing date was set at the end of February 2018.

On February 15, 2018, the debtor and Fannie Mae filed a consent motion for termination of the automatic stay of 11 U.S.C. § 362(a) effective as of March 1, 2018, and on March 6, 2018, pursuant to that motion the court entered an order granting Fannie Mae relief from the automatic stay, effective March 1, 2018, to permit Fannie Mae to proceed with foreclosure.  Fannie Mae set a foreclosure sale for April 26, 2018.

Odagbodo was unable to close in February 2018.  On March 3, 2018, Odagbodo executed an *Addendum to Purchase Agreement* ("*Addendum*"), which increased the security deposit by another $20,000 and fixed a closing date deadline of March 9, 2018.[2]  The *Addendum* states that the additional $20,000 deposit is "immediately non-refundable."

Odagbodo did not complete the sale by March 9, 2018. Paragraph 23 of the *Purchase Agreement* provided that "[t]ime is of the essence of this Agreement."  Paragraph 25 of the *Purchase Agreement* provided that "[a]ny future modification of this Agreement will be effective only if it is in writing, signed by the party to be charged."  The debtor never agreed in writing that the *Addendum* would be modified to permit a sale to be closed

---

[2]  The debtor had executed the *Addendum* on March 1, 2018. Odagbodo does not dispute that the *Addendum* was binding on him as an amendment of the *Purchase Agreement*.

4

after March 9, 2018. The debtor may have been agreeable to a closing on a date of the debtor's choosing, but was free to treat Odagbodo's failure to complete the sale by March 9, 2018, as a default by Odagbodo if he could not close on a later date of the debtor's choosing. However, Odagbodo failed to close on a date of the debtor's choosing.

Odagbodo asserted that he was unable to close because the bank through which he was attempting to obtain financing, Amalgamated Bank, required an American Land Title Associate ("ATLA") survey of the Property. He asserts that the debtor refused access to the Property for conducting the ATLA survey, but he fails to specify when that refusal occurred. Odagbodo also asserted that Amalgamated Bank required certain repairs be made on the Property before settlement, but the debtor refused access for those repairs to be made. However, he again failed to indicate when any request to enter the Property to make repairs was made and refused.

When Odagbodo was unable to obtain funding from Amalgamated Bank, he decided to use his own funds to purchase the Property. Odagbodo does not say when he made that decision. Odagbodo requested that the sale be completed sometime between April 9 through April 16, because he was leaving for Africa for his mother-in-law's funeral on April 16, 2018. Odagbodo asserts that he was contacted by the debtor's agent on April 20, 2018,

notifying him that the debtor was ready to close, and that Odagbodo was required to have papers notarized at the American Embassy in Abuja, Nigeria, 6 hours from Ado-Etika, Nigeria where Odagbodo was staying. Odagbodo did not complete the sale prior to April 26, 2018, and the property was sold via a foreclosure auction.

On June 21, 2018, the court held a hearing on three motions addressing the issue of who was entitled to turnover of the deposits.[3] In an oral decision at the hearing, the court ruled against Odagbodo and held that the debtor was entitled to turnover of the deposits (with Fannie Mae and the debtor to submit an agreed order resolving Fannie Mae's limited objection to the debtor's motion for turnover).

On June 26, 2018, the court entered orders reflecting the

---

[3] The three motions were:

- the debtor's *Motion for Entry of an Order Directing Premium Title & Escrow, LLC to Turn Over Security Deposit to Debtor* (Dkt. No. 156);

- the *Counter-Motion of Peter Odagbodo for Entry of an Order Directing Premium Title & Escrow, LLC to Turn Over Security Deposit* (contained in Odagbodo's opposition (Dkt. No. 165) to the debtor's motion for turnover); and

- the *Motion of Peter Odagbodo for Entry of an Order Directing Premium Title & Escrow, LLC to Turn Over Security Deposit* (Dkt. No. 167) reiterating in substance the grounds for turnover to Odagbodo that he had set forth in his counter-motion (part of Dkt. No. 165).

6

ruling of June 21, 2018, against Odagbodo.  On July 2, 2018, the court entered an *Order Resolving Limited Objection of Federal National Mortgage Association to Debtors Motion for Entry of Order Directing Premium Title & Escrow, LLC to Turn Over Security Deposit to Debtor*, which called for the funds to be held in the debtor's counsel's escrow account, and provided that "[t]he Deposit is subject to Fannie Mae's perfected liens, and may not be disbursed without further order of the court," specifically "pending a determination of amounts which may be due and owing to Fannie Mae following the foreclosure sale of the Property. . . ."

On June 25, 2018, in advance of the entry of the orders reflecting the court's oral ruling against him, Odagbodo filed, as permitted by Fed. R. Bankr. P. 8002(a)(2), a notice of appeal regarding the ruling.  Under Rule 8002(a)(2), the notice of appeal is treated as filed after entry of the orders entered on June 26, 2018, and July 2, 2018, implementing that ruling.

Odagbodo filed his *Motion* seeking a stay on June 28, 2018.  Fannie Mae, which asserts that it is entitled to the deposit, timely filed an opposition to the *Motion* on July 16, 2018.  On July 19, 2018, the court converted the bankruptcy case to a case under Chapter 7 of the Bankruptcy Code.  The Chapter 7 trustee, Wendell W. Webster, who displaced the debtor as representative of the bankruptcy estate, has not sought an extension of time to oppose the *Motion* seeking a stay pending appeal.

II

A party seeking a stay pending appeal must show (1) the likelihood that it will succeed on the merits of its appeal; (2) the likelihood it will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if a stay is granted; and (4) granting the stay is in the public interest. *S.E.C. v. Bilzerian*, 641 F. Supp. 2d 16, 19 (D.D.C. 2009).

### A. Odagbodo's Failure to Show a Likelihood of Success on Appeal

Odagbodo's *Motion* fails to attempt to show that he has a likelihood of success on appeal.  It is clear that there is no such likelihood of his succeeding on appeal.  The issue of turnover deals with two separate security deposit funds: the initial $100,000 security deposit under the *Purchase Agreement* and the $20,000 security deposit under the *Addendum*.

<u>No Likelihood of Success on Appeal Regarding the $20,000 Deposit</u>.  The $20,000 security deposit was "immediately non-refundable."  The precise language of the Addendum is important.  It states:

> 1. The modification of this Addendum will increase the price by $20,000. This money is immediately non-refundable.
>
> 2. Closing shall occur on or before March 9, 2018.

Accordingly, Odagbodo does not have a right to the increased $20,000 deposit.  There is no likelihood of Odagbodo succeeding on appeal as to the $20,000 deposit.

<u>No Likelihood of Success on Appeal Regarding the $100,000 Deposit</u>.  The original $100,000 deposit was not made immediately non-refundable.  The *Purchase Agreement* provided that Odagbodo would be entitled to a refund under two circumstances, namely, if the contract was voided,[4] or if there was no default by him other than a default caused by a breach of the debtor.  Odagbodo did not show that he voided the *Purchase Agreement* (or that he has a ground for voiding the *Purchase Agreement*).

Nor has Odagbodo shown that there was no default by him or that the default that occurred was caused by a breach of the debtor.  The *Purchase Agreement* included a liquidated damages provision in paragraph 11, under which the parties agreed:

> that the amount of Buyer's Deposit hereunder (as same may be increased by the terms hereof) is the parties' reasonable estimate of Seller's damages in the event of Buyer's default, and that upon Buyer's default in its purchase obligations under this agreement, not caused by any breach by Seller, Seller shall be released from its obligations to sell the Property and shall retain Buyer's Deposit (as same may be increased by the terms hereof) as liquidated and agreed upon damages, which shall be Seller's sole and exclusive remedy in law or at equity for Buyer's default.

The issues as to the $100,000 deposit, therefore, are whether Peter defaulted on his obligations under the *Purchase Agreement*,

---

[4] Paragraph 2 of the *Purchase Agreement* provided that the security deposit "[s]hall be held as earnest money and shall be applied as part payment of the purchase price at closing, and as otherwise provided herein."  Paragraph 2 also provided that "[i]f this Agreement is voided by Buyer for any reason permitted under this Agreement, the Deposit shall be refunded to Buyer, and no party hereto shall have any further rights to said Deposit."

9

and whether such default was caused "by any breach of Seller."

As to the issue of whether there was a default, Odagbodo had a deadline of March 9, 2018, to complete the sale. If he could not complete the sale by that date, he was in default. The original *Purchase Agreement* said that: "Closing shall be held on or before 45 days after Seller can deliver clear title, the closing date, or at such other time as is reasonably agreeable to Buyer and Seller, with at least five days notice prior to the closing date." This provision was amended by the *Addendum* which says "[c]losing *shall* occur on or before March 9, 2018." (Emphasis added). The *Addendum* set a hard closing date deadline. To the extent that the *Purchase Agreement* had permitted alteration of the original closing date of "on or before 45 days after Seller can deliver clear title" by permitting closing "at such other time as is reasonably agreeable to Buyer and Seller" that language was supplanted by the new requirement in the *Addendum* that Odagbodo was required to close on or before March 9, 2018.

Odagbodo did not close the sale by March 9, 2018, and therefore was in default. He argued in opposing turnover to the debtor that the original *Purchase Agreement*, which provides that the Buyer and Seller are able to agree to a reasonably agreeable date for changing the closing date, gives him a right to disregard the March 9, 2018, deadline. However, the *Addendum*

required that "[c]losing shall occur on or before March 9, 2018." There never was an agreement to change the March 9, 2018, deadline to another date. Odagbodo points to e-mails of April 2018 and a draft April 23, 2018, settlement statement as evidencing the debtor's having agreed to a new closing date to be held sometime in April 2018, and complains that the debtor failed to set a closing date that worked for Odagbodo. The only thing these documents show is that the debtor might have been willing to waive the default if Odagbodo closed on a date of the debtor's choosing after March 9, 2018, but Odagbodo never was prepared to close on a date of the debtor's choosing. Moreover, paragraph 25 of the *Purchase Agreement* provided that "[a]ny future modification of this Agreement will be effective only if it is in writing, signed by the party to be charged." None of the documents upon which Odagbodo relies are writings signed by the debtor in order to bind the debtor to a new closing date agreeable to Odagbodo.

Odagbodo complains that he was in Nigeria on the date that the debtor's agent gave him as a suitable date for closing, but he was in default, and the debtor never waived that default. The debtor could have waived that default if Odagbodo closed on a new date acceptable to the debtor, but Odagbodo never closed on a new date acceptable to the debtor.

The debtor never agreed in writing that the *Addendum* would

11

be modified to permit a closing after March 9, 2018, although it might have proceeded to a closing if Odagbodo was prepared to close on a date suitable for the debtor, and was free to treat Odagbodo's failure to complete the sale by March 9, 2018, as a default by Odagbodo.  So I appropriately concluded in my oral ruling that Odagbodo was in default.

That leaves only the issue of whether the debtor engaged in a breach that caused Odagbodo to default.  Odagbodo has not alleged any facts showing that between March 3, 2018 (when Odagbodo executed the *Addendum*) and the end of March 9, 2018 (the deadline for closing) the debtor caused him to default regarding his obligation, imposed by the *Addendum*, to close by March 9, 2018.  Odagbodo's allegations regarding non-cooperation of the debtor in the sales process do not show that the debtor caused him to default.

Odagbodo asserts, first, that at some unspecified time he was unable to close because Amalgamated Bank required an ATLA survey of the Property.  He asserts that the debtor refused access to the Property for conducting the ATLA survey, but he fails to specify when that refusal occurred and has not alleged that it occurred during the period of March 3, 2018, to March 9, 2018.  Moreover, Odagbodo admits that he decided not to pursue financing with Amalgamated Bank and decided, instead, to use his own funds to make the purchase, but he fails to indicate when he

12

decided to proceed in that fashion. If he made that decision prior to March 3, 2018, when he executed the *Addendum* calling for a deadline to close of March 9, 2018, then the debtor cannot be deemed to have caused him to default in refusing access for purposes of an ATLA survey requested by the bank.

Odagbodo also asserts that the bank required certain repairs be made on the Property before settlement, and the debtor refused access for that purpose. However, the sale was an "as is" sale. Moreover, Odagbodo fails to specify when the refusal occurred. If it occurred prior to March 3, 2018, when Odagbodo executed the *Addendum* requiring him to close by March 9, 2018, or after the March 9, 2018, deadline for closing, the refusal would be of no consequence.

At the hearing, Odagbodo's counsel contended that the debtor would not have been entitled to the deposit if Odagbodo had showed up for a closing and the debtor was unable to provide clear title, and speculated that the debtor lacked sufficient funds, in addition to whatever Odagbodo was required to bring to the table, to effectuate a closing of the sale. On that basis, he argued, evidence would be needed before the court can conclude that the debtor is entitled to obtain the deposit. The court rejected that argument. It would be a valid point if Odagbodo had shown up on or before March 9, 2018, and the debtor had been unable to close. However, the point is he didn't show up by

13

March 9, 2018, prepared to close and was in default. Any speculation that the debtor would not have been able to close does not establish that the debtor engaged in a breach that caused Odagbodo to be in default.[5]

For all of the foregoing reasons, there is no likelihood that Odagbodo will prevail on appeal.

### B. Lack of Irreparable Harm to Odagbodo at this Juncture

In his response to Fannie Mae's opposition to a stay, Odagbodo asserts that he is likely to suffer irreparable harm because the deposit funds will be liquidated and irrecoverable once they are transferred to the debtor. However, as reflected by the order entered on July 2, 2018, "[t]he Deposit is subject to Fannie Mae's perfected liens, and may not be disbursed without further order of the court," specifically "pending a determination of amounts which may be due and owing to Fannie Mae following the foreclosure sale of the Property. . . ." If the deposited funds are disbursed to Fannie Mae, it has a deep pocket and the funds will be recoverable from Fannie Mae should Odagbodo prevail on appeal. Until a determination is made regarding the

---

[5] It was up to the debtor to raise any necessary funds, in addition to the funds Mr. Odagbodo was to provide, in order to close the sale, and the debtor was free to raise any necessary funds required of it in whatever fashion it decided would be appropriate. It is entirely speculative that the debtor would not have been able to raise those funds. That speculation is not a basis for voiding the contract, or for finding a breach by the debtor that caused Odagbodo to fail to close by March 9, 2018.

14

amount remaining owed to Fannie Mae, it is premature to address Odagbodo's fear that the funds might end up in the debtor's hands, with a risk that Odagbodo could not recover the funds from the debtor if he prevails on appeal.

Moreover, to the extent that Fannie Mae is not owed a sufficient amount to be entitled to the entirety of the funds, the portion of the funds not required to satisfy Fannie Mae's lien will be administered by the Chapter 7 trustee as property of the bankruptcy estate, and will only be disbursed pursuant to orders of the court. It could be months before any such orders are sought. Once any such an order is sought to disburse the funds to creditors (or after satisfaction of their allowed claims, to the debtor), Odagbodo can then raise any concerns regarding his being unable to recover the funds, after they are disbursed, should he prevail on appeal.

It is thus premature at this juncture to address whether Odagbodo would be irreparably harmed if no stay is granted. In any event, because Odagbodo has not made a showing regarding the other elements for obtaining a stay pending appeal, no stay is warranted.

### C.  Harm to Fannie Mae and Other Parties

The only justification that Odagbodo provided the court for granting the *Motion* is that "[t]he subject funds are safely held and earning interest. A stay until the District Court has dealt

15

with this matter does not create a risk to Debtor." If Fannie Mae is paid the funds pursuant to its lien, it will be able to put those funds to use in its business. Although the funds are earning some interest in the debtor's counsel's escrow account (or in a segregated account held by the Chapter 7 trustee if the funds have been turned over to the Chapter 7 trustee), it is far more advantageous to Fannie Mae if it receives the funds now instead of receiving them, with some accrued interest, only after Odagbodo fails to prevail on appeal. The same is true as to other parties (the creditors or the debtor): it will be far more advantageous to them to receive the funds now instead of waiting until Odagbodo fails to prevail on appeal.

### D. The Public Interest

Odagbodo has made no showing that the public interest weighs in favor of a stay pending appeal. Odagbodo has made no effort to show that there is an issue on appeal as to which he has a likelihood of success, and likely is pursuing the appeal in the hopes that delay via a stay pending appeal will enable him to obtain a settlement allowing him to recover some part of the funds. In that circumstance, the public interest weighs in favor of denying a stay pending appeal. Even if there were some likelihood of Odagbodo's succeeding on appeal, the public interest would be neutral with respect to the competing private rights of Odagbodo and Fannie Mae to recover the funds.

IV

For the foregoing reasons, it is

ORDERED that the *Motion of Peter Odagbodo to Stay Orders of This Court Entered June 26, 2018 Directing Preimium* [sic] *Title & Escrow, LLC to Turn over Security Deposit to Debtor (#176) and its Order Denying Motion to Turn over Security Deposit to Peter Odagbodo (#178)* (Dkt. No. 180) is DENIED.  It is further

ORDERED that a copy of this *Memorandum Decision and Order* shall be transmitted to the District Court.

[Signed and dated above.]

Copies to: Recipients of e-notifications of orders.